Please report, Your Honor. This is Meredith Bloss for the petitioner, Alberto Rodriguez. We have a preliminary issue to discuss before we get into the merits of the claim in the petition, and that is whether the magistrate should have looked at the last state court pleading absent a reasoned decision from the state courts. My argument was that the form petition that the United States District Court for the Central District was using at the time that this petition was filed provided only a very small area to describe the nature of the state court. And allows no addenda? Well, it allowed one page, but it was clear that the court was – that the form indicated that it wasn't – it wasn't up to a pro se petitioner to put on that page. You just could do that if you wanted to. And so when – I must say that I did prepare that petition for my client. I did represent him all through the state courts, but I did not wish to appear because I did not wish the district court to require that I act pro bono for him all through the district court proceeding. So you prepared the document in secret? No, not in secret. No, no. I prepared the document. I told the court that I prepared it, and I filed a – for Alberto. I filed a request for appointment to counsel. But you – what does it mean that you didn't want to appear? And what are you saying? What's the implication of what you're saying? Well, the implication is that when we are appointed to represent clients in the state court, we are not appointed to file Federal habeas petitions for them. But some of our clients need to have Federal habeas petitions filed. But they are not capable of doing them themselves. And so the practice that I had undertaken in those days was to ghostwrite a petition for those clients who I thought had a serious Federal claim. In a previous case, I had signed it, and, in fact, I was never appointed. And, in fact, the district court required me to represent the client pro bono. You tried to make it look like the client had prepared it. No, no, no. No, I did not. I don't follow what the point is that you're trying to make. So, so what? The point I'm trying to make is when the court provides this kind of a form petition and it's filled out. Which you filled out? Which I filled out. And it's filled out in a summary fashion because that's all the room that there is to put down the issues. Then, and there's no reason decision from the state court that the court can look to to review, to see what the rationale was for denying the habeas petition below. I'm not following. I don't either. I thought we're supposed to look at the last reasoned decision, so I look at this decision by the California Court of Appeal, and your issue here is ineffective assistance, and I look at what they said about ineffective assistance. I must be missing something, but I don't know what. The California Court of Appeal issued a postcard denial of my petition, my habeas petition in the state court. The court didn't write anything. Well, what's the last decision you want us to look at? So there isn't a decision. It's postcard denials from the Court of Appeal. There's no decision. You're telling us there's no decision to look at from the state courts? Right. Not only on that issue, right? Not on the ineffective assistance of counsel issue. And that relates to the failure to call witnesses?  Yes. Failure to investigate. Okay. So on that issue, the district court said you didn't exhaust that claim? No. The magistrate said that the allegations were conclusory. And what I'm trying to argue in my third ---- Is that the form was too short to make anything other than conclusory allegations? Yes. That all you can do is ---- So now you're telling us you filled it out. It seems like you're shooting down your own client here. Right. I mean, obviously, a lawyer knows they can attach sheets of paper. But I still don't see why any of it matters. Well, a lawyer ---- Your Honor, you have to understand that ---- You're not before us. This fellow, Rodriguez, is before us. Yes. Are you pleading your ineffective assistance of counsel? If you'd like me to. So ---- No. Not exactly. What I'm saying is there is an issue certified to you on this subject, and it was raised by me. Look, there was kind of a reasoned decision. It's not on the precise same issue, but the State court was talking about whether there should have been a Marsden hearing. Oh, yes. And they said the question whether to call certain witnesses is a matter of trial tactics unless it results from an unreasonable failure to investigate. And here there was a proper inquiry, and the court accepted counsel's explanation. And that looked reasonable to me, too. I didn't ---- Well, here's the problem with that. That came up after trial was over. Alberto Rodriguez stood up and said to the court, my trial counsel has been inefficient ---- ineffective because I have all of these witnesses that had been identified. But they were so obviously ---- it was obviously silly. I mean, the investigator who goes on a roof looking for dog, well, sign is what the trappers  No, no, no. They're right. Looking for dog sign on the roof a month after. No. No. And he says ---- He remembers he was with. I'm talking about the co-manager of that building who would say ---- Oh, the co-manager. ---- that no one was allowed on the roof. Tommy Merritt, the only eyewitness against Mr. Rodriguez, says that he was standing on the roof and that he looked down into the street and he saw this shooting take place and that ---- I think he said he was looking in some transvestite's window, watching the transvestite undress. Yes. That's how he embellished the story. And he was walking his dog on the roof. And then ---- He was walking his dog on the roof. So the manager comes in and says I didn't allow anybody to be on the roof. I didn't allow people to be on the roof. He said he had permission to be on the roof. You know ---- They don't allow people to jaywalk, either. It's very ---- Didn't the Court, the Supreme Court, there was a reversal on that issue? Then what happened? Yes. Even the State Supreme Court said ---- Originally, the ---- Originally ---- Agreed that the matter was collateral. Yes, the Court did. But then after the case went back down to the Court of Appeals, the Seventh Division of the Second District reversed the conviction again on grounds that another witness of the defense tried to present the eyewitness who looked down and saw Mr. Rodriguez on the street at the time of the shooting with his friends, his gang member friends. The Court had also disallowed that witness. So this case was originally reversed twice by the Court of Appeals. In one of the cases, Judge Ikude is right that the Supreme Court said that the testimony of the co-manager would have been collateral, but there was a really nice dissent by Judge ---- Yes, but I don't care about the dissent. Tell us what you're worried about now. Okay. What I'm worried about now is that the magistrate said that the allegations were conclusory. And at the time when the ---- when the answer came in, and this is the problem of trying to help ---- We reviewed de novo. I don't really have it ---- I don't think it's before us to decide whether the magistrate erred. What's before us is to decide whether the State court acted ---- Well, it was one of the certified witnesses. If you wait for Judge Blinefeld to finish, I'll be able to understand your response to his question. Whether the State court acted contrary to or unreasonably applied Supreme Court authority. Now, on the ineffective assistance, it looked to me like that was the only issue. And what it boils down to is my lawyer should have put the investigator on the stand to say that a month later he didn't find any dog droppings on the roof. And he should have put the alibi witnesses on the stand to testify that I wasn't even there. And both of them look so phony that I really can't say that the State court acted contrary to or unreasonably applied Strickland. What am I missing? Okay. In my pleadings in the State court, I referenced two other investigators, not just the original one who was used. Remember, it's not about you. It's just about the ineffective assistance of counsel. Right. This is the second attorney to represent Mr. Rodriguez, not the first attorney. The first attorney, his investigator. Sperber. You're talking about Lawrence Sperber. This is Mr. Sperber. We got it. Mr. Sperber had an investigator that he had hired. Mr. Rodriguez was dissatisfied with how much work was done. But what is the investigation going to do? There are no dog droppings on the roof a month later. So what? It might have rained. There are several other issues that could well have been investigated and that both of these newer investigators brought up. One was this very important issue that Tommy Merritt could see the little number 18 tattooed on Mr. Rodriguez's cheek from the roof down to the car where he drove by. And he did testify that he could tell that it was Mr. Rodriguez's face, even though he didn't look up at him, because of the tattoo and his heavy mustache. 18th Street, as you know, is a huge gang, thousands of members. And the investigator who was working for Mr. Sperber actually went over to Detective Pelletier's office and looked at a mug book of 18th Streeters. Many, many of them have the number 18 tattooed on their faces. Apparently, Mr. Rodriguez knew of one who was, in fact, in prison in Northern California who could have been Mr. Rodriguez. Look, it's got to be ineffective assistance. It's not a question of whether there was proof beyond a reasonable doubt. No. And on ineffective assistance, I looked at, well, considering the logic of it, if he could see well enough to enjoy watching the transvestite undress, it suggests he had a good enough view to be worth looking. Well, he assumes the light was on in the room where the transvestite was undressing. This was at night and a car driving by on the street. But those photographs of what could be seen from the roof, I understand there were photographs that were presented to the jurors. So the jurors could make their own evaluation of what the individual Merritt could see. Yes, but one of the newer investigators had gone back over the evidence, the physical evidence at the scene where the beer cans had been left and the casings from the shots, and they were further away than Tommy Merritt said. But he didn't go up on the roof. I mean, that was he – this was Mr. Ford you're talking about? Mr. Ford, yes. Yeah. He was down the street and he's looking up at the roof, but he didn't get access to the roof. So the evidence didn't sound like it was very persuasive. Well, it seems to me, Your Honor, that it's accumulation of evidence that becomes persuasive. When Mr. Ferber decides that he's going to present at the second trial a no-defense defense and he gets a hung jury 7-5 for conviction, it seems to me that that's a matter of grace and good luck. And he should at that time have realized that depending on that and not presenting any kind of evidence that undercut the witnesses that were against Mr. Rodriguez was ineffective on the face of it. You don't allow – first of all, Mr. Merritt by that time is dead of AIDS. Oh, no. You put – you've got tactical questions all the time about putting on witnesses. For one thing, as you say, the dog walker is dead, so he can be – he's likely to be less effective than he was when he was alive. Actually, you know, I think more effective, Your Honor. Well, it's arguable. And also, if you put on phony witnesses, witnesses that the jury thinks are lying, then it just kills you in the defense of a case. So if you think you can establish a reasonable doubt without them, you go for it. That's just what tactical decisions mean. Yes, but then halfway through the third trial, when Mr. Sperber saw that things were not going so well, he suggested to Mr. Rodriguez that he get up and tell his side of the story without any other witnesses to support it. And that seems to me just right there. That is not sufficient. This is a case in which Mr. Rodriguez was relying on his counsel to put on his defense. Am I right that you're not really saying that the lawyer never investigated and found out things that were available to him? What you're saying is he made bad tactical decisions in the defense of the case. No, he never investigated. He never talked to any witness. He never talked to any of the witnesses. Any of the witnesses testified. But he had the reports, right? He had the reports. But is that sufficient when you're a trial counsel who's going into a third trial and these witnesses testified years ago? I don't think so. Did he have the transcript of the first trial? Yes, he did. One of your points is it was ineffective assistance not to call the alibi witnesses. Is that right? Yes. The Dorcas Powell who could see, who looked down when she heard the shots and saw Alberto on the street with bullet guns in his hands. I didn't understand the reference to Dorcas Powell. I mean, wasn't the evidence that she was missing and nobody could find her and that the attorney had searched? So it was hard for me to understand how failure to call her when she was unavailable could be ineffective. She was. He didn't try to find her again for the third trial. He didn't find her for the second trial, but he didn't try to find her again. Sure, it might take a little bit of doing for an investigator to find someone who's living in sort of a, you know, in an area like this. These are transient people, and I realize that it's not that easy to be a defense counsel to a gang member. But it seems to me that in this case there were a number of witnesses. And I just want to mention Francine Owens, the new witness who came in and said that my client had had a fight with the murder victim the night before the shooting. She did get a quid pro quo for her testimony. And Mr. Sperber just basically gave up trying to get that information before the jury because the new DA on the case denied it vociferously. And it may indeed be true that Detective Pelletier didn't offer her anything, but in fact it's on the record that she got something. What's your point now about Gutierrez and Alla Lucy? I believe that they at least should have been investigated. But even if those witnesses that would put him on the street were not called in the third trial, he at least should have called the witnesses who would have undercut the two most important witnesses against Rodriguez, which were Tommy Merritt and Francine. And the thing to undercut Francine is that she got a quid pro quo for her testimony. And also Rodriguez knew the name of the person who was the lessee in the cross pad in the flop house where they were all staying. That person could have said, you know, it's just not possible that Valerie was up in the morning singing, happy, making breakfast. We never had any food in that place. I mean, it's just the kinds of little facts that people put in their testimony when they're lying, that's the place where you have to try to get them. And good counsel knows that. And I just feel like he never got a trial. And all I really was trying to get from the magistrate was an evidentiary hearing so that it could be demonstrated that there was a lot of work that this counsel could have done for this client that he didn't do and that he should have done. Thank you, counsel. Okay. Good morning. May it please the Court. Jonathan Klein, Deputy Attorney General for Respondent C.A. Terhune. Just to start off, the issue, one of the issues that was certified for appeal was whether Petitioner's claim that his attorney was constitutionally ineffective for failing to call his defense witnesses a la Lucy Powell and Gutierrez was properly presented to the district court for habeas review, and if not, whether the district court should nonetheless have exercised its discretion to consider that claim. I believe that can be short-circuited fairly quickly here because the district court did consider that claim. I believe it's page 6 of the excerpts of record. The district court said even assuming these claims were properly raised in the petition, they are meritless in part because it was the defense attorney's strategy to not place Petitioner at the scene of the crime. And as has been noted, during the second trial, that was his strategy, and it resulted in a hung jury. The first trial, the witnesses were or did testify that he was there and he was convicted. So it was clearly within the wide range of reasonable tactical decisions to do that. But anyway, the point I'm trying to make is that the district court did, in fact, resolve that issue. So I believe there is no case or controversy here, and that is moved. The line 23, page 6. I believe that is correct, Your Honor. And with respect to the second issue was whether there should have been investigator testimony to impeach the testimony of Tommy Merritt. Basically, throughout the record here, there are really only two investigators that could have said anything that could even conceivably have helped Petitioner in this case. The first one was Douglas Urschel, and he did testify in Petitioner's first trial, the one in which he was, and he was convicted in that trial. So obviously, his testimony could not have been too terribly beneficial to Petitioner. And really, when looking at his testimony, basically the only thing he said that could even help Petitioner marginally was, as noted earlier by Judge Kleinfeld, that he inspected the roof in 1996 and found there was no evidence of dog waste, but the murder here occurred in 1995. So the condition of the roof in 1996 was really not probative at all as to its condition in 1995. So it could have been a very reasonable decision to not present that testimony again. The other investigator was C.J. Ford, and as a preliminary matter, we don't know what contact, if any, Ford had with Lawrence Sperber, the second attorney. It's possible Sperber didn't even know of Ford, or it's possible he, they spoke and he found that his conclusions were not credible and would have hurt his client's cause. There's just no evidence of that in the record. And Can I turn you to the pictures materials issue? Because I have a question about what the framework for analysis of that is. The state court made a finding about the Miranda issue. Is that right? Or am I in a different case? I don't recall any Miranda issue. And the Pitchess examination of information in camera? Yes. There was a Pitchess. And I believe the framework is the petitioner in this case has to make a colorable claim that he was prejudiced by his attorney's alleged mishandling of the Pitchess materials. Where I'm hung up on that is I don't know what the state court looked at in camera. And it seems, was there not a request here to find out what it was? How can we measure whether the state court is right or wrong, was right or wrong, without knowing something about what the state court looked at? Well, Your Honor, the state, you're correct. The state court did look at that. And in all Pitchess hearings, well, I guess in this case, there was, the procedural scenario was a bit different than in the average case, because there was an initial Pitchess hearing, then there was a change of attorneys, then a second Pitchess hearing. But getting back, well, what petitioner has, petitioner has to show a colorable claim that there could be something. But how do we know that when we don't know what was in there and the petitioner wasn't showing what was in there? Well, we do know some things. We do know that there was only one item of impeachment material. How do we know that? How do we know that the state court's finding was supported by the record when we can't review the record? That's my concern. That's the problem I have, too. I don't know how we handled that. And there was a request in the district court here for an evidentiary hearing to explore that. It was denied. Yes, Your Honor. I would go back to the fact that petitioner has to make a colorable claim here. How can you, without knowing what you're talking about? The state court looked at it and said, nothing here. And we're supposed to review that. You're asking us just to assume that the state court was right. Well, the state court did say that of all the material that was ordered released, none of it related to officers who testified at trial except for one item relating to Detective Pelletier. And they said that that item, by its very nature, was not prejudicial. And for an evidentiary hearing to be granted, there has to be more than speculation. Essentially, petitioner's claim here is we need an evidentiary hearing, and we can look and just maybe, possibly, conceivably, there might be something really good in there that would help me. But that seems to me to be more than enough. The state court thought it was worthwhile to look under the covers and see whether there was anything? Well, I believe the state court is required when there's a Pitchess motion to go in camera with a representative from the police agency and go over the material. Yeah, that's the point. State law mandates and requires that. And yet we have no idea, no way of evaluating what was done. Well, as a policy matter, Pitchess motions are not uncommon at all in state court. I'm familiar with that. I knew Pete Pitchess. He started it. And if every defendant was permitted to say, well, you know, maybe the trial court got it wrong here, maybe there was something that should have been released, for example, we need a Federal evidentiary hearing to flesh this out. So aren't you saying that the Pitchess blocks AEDPA and just prevents us completely from even the minimal review that we do? Well, I'm saying under the facts of this case, we have to look at what the Pitchess material is related to. They're related to one witness whose testimony was really not that important. What does not that important mean? Detective Pelletier, everything he testified to was either corroborated by another witness or it was independently verifiable. So even if we were to just assume that there was something terrifically scandalous and the jury was to throw out his testimony completely, that does not even reach the level of a reasonable probability that the verdict would have been different. I need a little help here. I keep being behind where you are probably because I'm not a California lawyer. Tell me if I've got this right so far. What this Pitchess thing is all about is that in California, defense lawyers want to get the court to take an in-camera look at a policeman's personnel file to see if there's something in the policeman's personnel file that would tend to impeach the policeman's testimony. Am I right so far? That is correct, Your Honor. Okay. And then there's this policeman named Pelletier who had something in his personnel file. Yes, Your Honor. No other policeman did. There was one item in relation to Detective Pelletier. Is that right? Correct. And it was just Pelletier? Correct. And the defense lawyer never got to see the item on Pelletier. Is that correct? That is correct, yes. Okay. And what did Pelletier testify to in this case? Detective Pelletier corroborated the testimony of Francine Owens. Could you say what he said? Don't give me legal words like corroborated, just factual words. Yes. The gist of his testimony, first of all, he testified as to the location of the shell casings, I believe, on the street and authenticated photographs relating to those. He testified that he spoke to witness Francine Owens and that Francine Owens gave him a statement consistent with her testimony at trial. He also testified as to his conversations with Tommy Merritt and essentially gave background as to how Merritt met with him and how the police discovered Tommy Merritt and how he came to get help. Okay. Now, why don't you need an evidentiary hearing to find out whether the defense lawyer should have been allowed to get the materials that would show that Pelletier is a liar? I believe the answer to that is twofold. First of all, Pelletier's importance in this case, since everything he testified to was either independently verifiable or other witnesses testified to the exact same things who are not police officers, that even if we were to assume the worst. There was other evidence on where the brass was? Excuse me? There was other evidence on where the brass was, shell casings as you called them? I believe, well, no, I don't believe there was. Did it matter? But we did have photographs and we did have Tommy Merritt's testimony describing what he saw and there were photographs that the jury could have seen where they would have known where the incident took place. So I think that testimony by Pelletier was essentially for background and I don't think it really went to the heart of the prosecution case whatsoever. Are you saying it wouldn't really matter where the brass was, no question that somebody had shot the victim, just a question of whether it was Rodriguez? I keep trying to translate the legal generalizations into the facts of the case. I'm sorry about that. It was never an issue at trial as to exactly where the people were. I think everyone was always in agreement that Tommy Merritt was right here, the shooting took place right here, here's a photograph of what Tommy Merritt saw. So the location of the shootings would have specified where the police found them, but again, there really wasn't any dispute as to that during the trial. So his testimony would not have been that helpful, even if it were not there. It was mainly to fill in the background gaps here. And secondly, the point I made earlier is that to get a Federal evidentiary hearing, there's got to be something more than speculation. And essentially, all there is here is speculation that maybe if we look at this, maybe, just maybe, it'll be great, but I would submit that that does not rise to the level of a colorable point. Unless the Court has any questions, I would submit. Thank you. Roberts. Thank you, counsel. Unless my colleagues have further questions, I think we've exhausted the time. Rodriguez v. Terhune is submitted. Can I just say that Detective Palantir went to an interview?  Next is United States v. Harris.
judges: Trott, Kleinfeld, Ikuta